BDM:KKO
F. #2017V01840

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -X

In re the Seizure of:

ANY AND ALL FUNDS ON DEPOSIT AT
JPMORGAN CHASE BANK, N.A.
ACCOUNT NUMBER ENDING IN 3913,
HELD IN THE NAME OF "EDWARD V.
SAPONE, LLC ATTORNEY TRUST
ACCOUNT IOLA," UP TO AND
INCLUDING THE SUM OF THREE
HUNDRED THIRTY THOUSAND EIGHT
HUNDRED FORTY-SEVEN DOLLARS
AND EIGHTY-SIX CENTS ($330,847.86),
AND ALL PROCEEDS TRACEABLE
THERETO.

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR
SEIZURE WARRANT

Docket No. 19-M-701

- - - - - - - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK, SS:

      MICHAEL LEVER, being duly sworn, deposes and states as follows:

      1.     I am a Special Agent with the Federal Bureau of Investigation (the "FBI") and have been so employed since 2015. During my tenure with the FBI, I have participated in long-term investigations into civil rights violations and other crimes, during the course of which I have conducted physical and electronic surveillance, executed search warrants, reviewed and analyzed location data, reviewed and analyzed banking and credit card accounts and transactions, reviewed and analyzed numerous taped conversations and debriefed cooperating witnesses.

2. As a Special Agent, I am a Federal Law Enforcement Officer within the meaning of Rule 41(a) of the Federal Rules of Criminal Procedure, that is, a government agent engaged in the enforcement of the criminal laws of the United States and thereby authorized to request the issuance of federal seizure warrants.

3. The information contained in this affidavit is based on my review of trial testimony and exhibits in *United States v. Raniere*, 18-CR-204 (NGG), other statements and information provided by witnesses, my personal knowledge and observations during the course of this investigation, my personal training and experience as a criminal investigator, information provided by other law enforcement personnel, and my review of records, documents, and other physical evidence obtained during this investigation, including but not limited to real estate transaction records and bank records.

4. Because this affidavit is submitted for the limited purpose of establishing probable cause for the requested seizure warrant, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth herein only those facts which I believe are necessary to establish probable cause to support the requested seizure warrant.

## PURPOSE OF THE AFFIDAVIT

5. I make this affidavit in support of the government's applications for the issuance of a seizure warrant for the following property:

> any and all funds on deposit at JPMorgan Chase Bank, N.A. account number ending in 3913, held in the name of "Edward V. Sapone, LLC Attorney Trust Account IOLA" (the "Sapone Attorney Trust Account"), up to and including the sum of three hundred thirty thousand eight hundred forty-seven dollars and eighty-six cents ($330,847.86), and all proceeds thereto (the "SUBJECT FUNDS");

6.      As set forth below, there is probable cause to believe that the SUBJECT FUNDS are subject to seizure and forfeiture pursuant to 18 U.S.C. §§ 1594(d)(1) and 1594(e)(1) as property, real or personal, that was involved in, used or intended to be used to commit or to facilitate the violation of 18 U.S.C. §§ 1589, 1590 and/or 1591, and property traceable to such property.

## STATUTORY FRAMEWORK

7.      Title 18, United States Code, Section 1589(a) prohibits knowingly providing or obtaining the labor or services of a person by any one of, or by a combination of, the following means: (1) force, threats of force, physical restraint or threats of physical restraint to that person or another person; (2) serious harm and threats of serious harm to that person or another person; (3) abuse or threatened abuse of law or legal process; and (4) any scheme, plan or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

8.      Title 18, United States Code, Section 1590(a) prohibits knowingly recruiting, harboring, transporting, providing, or obtaining by any means, any person for labor or services in violation of Chapter 77 of Title 18, including 18 U.S.C. § 1589.

9.      Title 18, United States Code, Section 1591(a) provides, in relevant part:

(a) Whoever knowingly—

> (1) in or affecting interstate or foreign commerce . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
>
> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

3

knowing . . . that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act . . . shall be punished . . . .

10. Title 18, United States Code, Section 1591(e)(2) defines "coercion" as including "threats of serious harm to . . . any person."

11. Title 18, United States Code, Section 1591(e)(5) defines "serious harm" as:

any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

12. Title 18, United States Code, Sections 1594(a) and (b), provide, in relevant part, that any attempt or conspiracy to violate Sections 1589, 1590 and/or 1591 shall be punishable in the same manner as a completed violation of that section.

13. Pursuant to Title 18, United States Code, Section 1594(d)(1), a court imposing a sentence on a person for violating 18 U.S.C. § 1589, 1590 and/or 1591, *inter alia*, "shall order . . . that such person shall forfeit to the United States . . . such person's interest in any property, real or personal, that was involved in, used, or intended to be used to commit or to facilitate the commission of such violation, and any property traceable to such property."

14. Pursuant to Title 18, United States Code, Section 1594(e)(1) "any property, real or personal, involved in, used, or intended to be used to commit or to facilitate the commission of any violation" of 18 U.S.C. § 1589 and 1590, *inter alia*, "and any property traceable to such property" is "subject to forfeiture to the United States and no property right shall exist in them."

4

15. Pursuant to 21 U.S.C. § 853(f), as incorporated by 28 U.S.C. § 2461, this Court is empowered to issue a seizure warrant for any property subject to forfeiture under 18 U.S.C. § 1594(d)(1).

16. Pursuant to 18 U.S.C. § 981(b), as incorporated by 18 U.S.C. 1594(e)(2), this Court is empowered to issue a seizure warrant for any property subject to forfeiture under 18 U.S.C. § 1594(e)(1).

## RELEVANT FACTS

Criminal Charges, Guilty Pleas and Conviction at Trial

17. On or about June 19, 2019, defendant KEITH RANIERE, also known as "Vanguard," "Grandmaster" and "Master," was convicted by a jury of racketeering conspiracy, racketeering, forced labor conspiracy, wire fraud conspiracy, sex trafficking conspiracy, sex trafficking, and attempted sex trafficking. (18-CR-204, Docket Entry no. ("DE #") 735). RANIERE had been charged with these crimes in a superseding indictment filed on or about March 13, 2019. (*Id.*, DE #430, the "Superseding Indictment").

18. RANIERE was the founder of several pyramid-structured organizations (the "Pyramid Organizations"), including, but not limited to, (1) Nxivm; Executive Success Programs, Inc.; Jness, LLC; Society of Protectors, LLC; Ultima and other related entities (collectively, "Nxivm"); and (2) an organization referred to as "DOS," the "Vow" and "the sorority" (collectively, "DOS"). In leading the Pyramid Organizations, RANIERE relied on certain individuals, sometimes referred to as his "inner circle," who were accorded special positions of trust and privilege with RANIERE and who carried out his directives.

19. Members of RANIERE's inner circle also held high positions, or had an ownership interest, in one or more of the Pyramid Organizations, including serving as

5

executives, directors and officers of Nxivm. Members of RANIERE's inner circle also, at times, served as "first-line masters" in DOS directly under RANIERE, meaning that they comprised the second-highest level within the DOS "pyramid" and that, other than RANIERE, they wielded the most power within DOS.

20. Several members of RANIERE's inner circle were charged as co-defendants in the Superseding Indictment, including LAUREN SALZMAN and ALLISON MACK. SALZMAN and MACK were both first-line DOS masters under RANIERE. On or about March 25, 2019, SALZMAN pleaded guilty to racketeering conspiracy and racketeering, and admitted to the following racketeering acts: trafficking of a woman ("Jane Doe 4") for labor and services, the extortion and forced labor of two other women who were lower-ranking DOS members ("Jane Does 6 and 11"), and wire fraud of lower-ranking DOS members. On or about April 8, 2019, MACK pleaded guilty to racketeering conspiracy and racketeering, and admitted to the following racketeering acts: extortion and forced labor of two lower-ranking DOS members ("Jane Does 5 and 8"), and wire fraud of lower-ranking DOS members. RANIERE's other co-defendants also pleaded guilty to various charges.

21. On or about May 7, 2019, trial commenced against RANIERE alone. SALZMAN and Jane Does 4, 5 and 8, among others, testified for the government at trial.

The Racketeering Enterprise

22. RANIERE and his inner circle, and others known and unknown, comprised an organized criminal enterprise (the "Enterprise"). The Enterprise, including its leadership, membership and associates, constituted an "enterprise" as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact that was engaged in, and the activities of which affected, interstate and foreign commerce. The

6

Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.

23. The principal purpose of the Enterprise was to promote RANIERE and to recruit new members into the Pyramid Organizations. By promoting RANIERE and recruiting others into the Pyramid Organizations, the members of the Enterprise expected to receive financial opportunities and personal benefits, including increased power and status within the Enterprise.

24. The Enterprise operated within the Eastern District of New York, the Northern District of New York and elsewhere, including overseas.

25. Among the means and methods by which the defendants and their associates participated in the conduct of the affairs of the Enterprise were the following:

    a. Promoting, enhancing and protecting the Enterprise by committing, attempting and conspiring to commit crimes, including but not limited to visa fraud, identity theft, extortion, forced labor, sex trafficking, money laundering, wire fraud, tax evasion and obstruction of justice;

    b. Demanding absolute commitment to RANIERE, including by exalting RANIERE's teachings and ideology, and not tolerating dissent;

    c. Inducing shame and guilt in order to influence and control members and associates of the Enterprise;

    d. Obtaining sensitive information about members and associates of the Enterprise in order to maintain control over them;

    e. Recruiting and grooming sexual partners for RANIERE and obtaining nude photographs of women for RANIERE;

    f. Isolating associates and others from friends and family and making them dependent on the Enterprise for their financial well-being and legal status in the United States;

      g.      Protecting and attempting to protect RANIERE and the Enterprise by, among other things, gaining political influence and evading regulatory agencies;

      h.      Using harassment, coercion and abusive litigation to intimidate and attack perceived enemies and critics of RANIERE; and

      i.      Encouraging associates and others to take expensive Nxivm courses, and incur debt to do so, as a means of exerting control over them and to obtain financial benefits for the members of the Enterprise.

DOS

      26.      As set forth in the Superseding Indictment and established at trial, members of DOS, a secret organization founded by RANIERE, recruited young women by force and fraud into DOS. DOS was comprised of "masters" who recruited and commanded groups of "slaves," who were typically recruited from within the ranks of Nxivm's membership. DOS masters persuaded slaves to join DOS by describing it to prospective slaves as a secret women's empowerment group or sorority and hiding the fact that RANIERE was actually the leader of DOS. Prospective slaves were asked to provide naked photographs, assets, criminal confessions and other damaging information – true or untrue, about themselves or others close to the slaves – as "collateral" to prevent them from leaving DOS or disclosing its existence to others. The DOS masters required collateral that was sufficiently damaging that the slaves would fear psychological, financial, or reputational harm to themselves or others if the collateral were to be disclosed. For example, SALZMAN testified that one slave she recruited "submitted a letter to her children that would have effectively severed their relationship."

27.    DOS masters benefited financially from recruiting and maintaining DOS slaves. DOS slaves were often required to perform "acts of care" for their masters and to pay "tribute" to their masters, including by performing tasks that would otherwise be compensable. In addition, multiple DOS slaves were directed to seduce RANIERE, which they felt coerced to do because noncompliance would risk release of their damaging collateral. Some DOS slaves were also branded in their pelvic regions with a symbol that, unbeknownst to them, actually comprised RANIERE's initials.

28.    At trial, SALZMAN testified that the DOS first-line masters met three times a week, or about ten hours a week. Initially these meetings were held in the homes of the DOS first-line masters, but later they purchased a "sorority house" located at 9 Milltowne Drive, Waterford, New York (the "DOS House"). After purchasing the DOS House, the meetings were held there going forward. During meetings, the DOS first-list masters discussed projects they were working on for DOS, among other topics. Sometimes RANIERE would attend these meetings and speak to them about their projects, such as a book explaining DOS concepts and philosophy regarding masters, slaves and collateral; enrollment or recruitment into DOS; and a dungeon that would be located at the DOS house. At DOS first-line meetings after the DOS House was purchased, RANIERE also shared that each slave should be doing about an hour a week of work for their masters, and how to use paddles to perform physical punishment for failures. SALZMAN performed work for RANIERE that she believed would help him, such as picking up groceries, and she participated in paddling with other first-line slaves when they failed at a task assigned by RANIERE. SALZMAN also communicated this information to her slaves who performed work for her and paddled each other if they failed to perform a task she assigned.

29. SALZMAN also advised agents during proffers with the government that she attended meetings at the DOS House in which the first-line slaves discussed the "Seduction Assignment," an assignment directing lower-level slaves to seduce RANIERE. During one of these meetings, RANIERE was present and told his first-line slaves to address public inquiries about the Seduction Assignment by saying that it was just a test of loyalty and that the lower-level slaves were not actually required to complete it. However, SALZMAN learned from other first-line slaves that multiple women who had been tasked with the Seduction Assignment had sexual interactions with RANIERE.

30. At trial, "Nicole" testified that she was one of MACK's slaves. Nicole testified that at the time she was involved in DOS, she was living in Brooklyn, New York. She further testified that she prepared her collateral and performed work for MACK while in Brooklyn.

The DOS House and Tracing of the SUBJECT FUNDS

31. SALZMAN testified at trial that she understood that Rosa Laura Junco ("Junco"), a first-line master and member of RANIERE's inner circle, purchased the DOS House. SALZMAN testified that she and the other seven first-line DOS masters were responsible for the DOS House maintenance and expenses.

32. According to a recorded deed for the DOS House, it was purchased in the name of Stinka LLC for approximately $346,000.00 on or about April 14, 2017. Bank account records for the attorney account from which the $346,000.00 was paid show that it was funded by a wire transfer from an account held in the name of Junco in trust for two other persons. According to the Delaware Department of State, Division of Corporations ("DOS-DOC"), Stinka LLC was incorporated on or about October 4, 2016. According to the New

York State DOS-DOC database, Stinka LLC is a Delaware limited liability corporation that registered with New York State on or about September 14, 2018. According to the New York DOS-DOC database, the address for process for Stinka LLC is 557 Englemore Road, Clifton Park, New York ("557 Englemore"). According to a recorded deed for 557 Englemore, Junco purchased 557 Englemore on or about April 2, 2014.

33. According to a recorded deed for the DOS House, it was sold on or about October 25, 2018 for approximately $358,000.00 (the "October 2018 Sale"). The deed was signed by Nicole Clyne, as a member of Stinka LLC. Clyne was one of the eight first-line DOS slaves under Raniere. Included in the closing documents for the October 2018 Sale was a "Statement of Authorized Person" for Stinka LLC dated October 4, 2016. According to this statement, Stinka LLC adopted a resolution stating that Clyne was appointed as the initial Managing Member of the company. A copy of Clyne's Canadian passport was included in the closing documents.

34. The closing documents for the October 2018 Sale also included a Statement of Sale that calculated that the total amount due to the seller, after accounting for the buyer's deposit and various credits to the buyer and seller, was $338,847.86. This amount was disbursed in two checks. One check was issued to Clyne in the amount of $3,000.00. Clyne deposited this check into a personal account at TD Bank held in the name of Clyne and MACK. The balance of this account as of May 8, 2019 was approximately $168.95. The second check was issued to Edward V. Sapone, LLC in the amount of $330,847.86. This check was not negotiated until December 21, 2018 when it was deposited into the Sapone Attorney Trust Account. As of June 28, 2019, the balance in the Sapone Attorney Trust Account exceeded the amount of the SUBJECT FUNDS.

35.    In the course of my investigation, I have learned that Sapone represents Clyne. Bank records for Clyne's checking account at TD Bank include a check to Sapone dated April 20, 2018 for $15,000 with the note "legal retainer." Bank records for a common defense fund created for Nxivm community members in need of representation show that on or about September 21, 2018, approximately $16,834.50 was transferred to Sapone's law firm.

36.    Based upon the foregoing, there is probable cause to believe that the SUBJECT FUNDS constitutes property that was involved in, used or intended to be used to commit or to facilitate the violation of 18 U.S.C. §§ 1589, 1590 and/or 1591, or property traceable to such property. Specifically, the SUBJECT FUNDS are traceable to the proceeds of the DOS House, which was used by DOS members to facilitate their conspiracy to recruit women into DOS at which time they would be coerced, due to their collateral and physical punishment, to perform work for their masters and engage in sexual acts with RANIERE.

37. Accordingly, I respectfully request that the Court issue a warrant pursuant to Title 18, United States Code, Section 981(b) and Title 21, United States Code, Section § 853(f), authorizing the seizure of the SUBJECT FUNDS.

38. It is further respectfully submitted that a restraining order, pursuant to 21 U.S.C. § 853(e), will not be sufficient to preserve the assets in question given the ease with which any funds in the Sapone Attorney Trust Account can be moved or transferred, including by wire or electronic funds transfer.

Dated: Brooklyn, New York
      August 7, 2019

_____
Michael Lever
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me this
7th day of August 2019

_____
HONORABLE SANKET J. BULSARA
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK